## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JEANETTE A. LOPEZ,

        Plaintiff,

v.                                  No. CIV 11-248 LFG/KBM

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

        Defendant.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Jeanette A. Lopez's ("Lopez") Motion to

Reverse and Remand for a Rehearing with Supporting Memorandum, filed July 28, 2011. [Doc. 17.]

The Commissioner of Social Security issued a final decision denying benefits, finding that Lopez

was not entitled to disability insurance benefits ("DIB"). The Commissioner filed a response to

Lopez's motion [Doc. 20], and Lopez filed a reply [Doc. 21]. Having considered the pleadings

submitted by the parties, the administrative record and the applicable law, the Court decides that the

motion to remand should be granted for the reasons stated below.

## I.    PROCEDURAL RECORD

On about September 7, 2007, Lopez applied for DIB [12, 81], alleging she was disabled since

June 6, 2006, due to diabetes, migraine headaches, depression, and body aches. [AR 81-83, 98.]

Lopez's DIB application was denied at the initial and reconsideration levels. [AR 40, 42, 43, 51.]

On July 20, 2009, the ALJ conducted an administrative hearing, at which Lopez appeared and was

represented by counsel. [AR 23.] On September 25, 2009, the ALJ issued a decision finding Lopez

was not disabled and denying her benefit application.  [AR 12-20.]  On November 25, 2009, Lopez

filed a request for review, and submitted an attorney's letter in support of her request. [AR 6-8.] On

February 1, 2011, the Appeals Council denied her request for review. [AR 1.]  On March 22, 2011,

Lopez filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

 Lopez was born on February 12, 1960, and was 49 years old at the time of the ALJ hearing.

[AR 81.]  Lopez obtained her G.E.D. in October 1978. [AR 132.]  She is currently married and has

three grown children from two marriages. [AR 194, 196.]

 Lopez worked as a medical records clerk at Lovelace Medical Center for about 25 years.

She left the position on June 6, 2006, because of her diabetes.  She also stated she was stressed,

having headaches and generally, "could not cope" at that time.  [AR 24.]  She did not seek workers'

compensation or unemployment benefits when she left her longtime job, nor does she receive a

pension.[AR 25.]  Lopez's husband works for the City of Albuquerque, and he pays the bills. [AR

25, 26.] Lopez also worked for a friend from about March 2009 to September 2009 and made about

$129.00 every two weeks. [AR 14, 25, 162.] Lopez told a consultative examiner that she had worked

on an assembly line where she tagged jewelry and at Bueno Foods, but it is not clear when this work

occurred. [AR 207.]

 Lopez's earning records indicate that from 1984 to 2005, her annual salary ranged from

about $10,000 to $23,000.  In 2006, she made $12,400. [AR 86.]

## II. STANDARDS FOR DETERMINING DISABILITY

 In determining disability, the Commissioner applies a five-step sequential evaluation

process.[1]  The burden rests upon the claimant to prove disability throughout the first four steps of

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, she is capable of performing other work.[8]

Here, the ALJ determined at step four that Lopez's RFC to perform light work did not prevent her from preventing her past relevant work as a medical records clerk. [AR 18.] The ALJ

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

made an alternative finding at step five of the sequential process that there other existing jobs in the national economy that Lopez could also perform. [AR 18.]

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence. Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991). Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he

> chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

In denying Lopez's DIB application, the ALJ made the following findings: (1) Lopez had not engaged in substantial gainful activity since the alleged onset date of June 6, 2006; (2) she had severe impairments of a depressive disorder, diabetes mellitus ("DM"), and migraine headaches; (3) none of the impairments or combination of impairments met a listed impairment; (4) Lopez had the RFC to perform light work that includes the ability to understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in the work setting; (5) Lopez's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC; (6) she was capable of performing her past relevant work; and (7) alternatively, the grids, used as a framework, supported a finding that Lopez was not disabled, and that jobs existed in the significant numbers in the national economy, that she could also perform. [AR 14-19.] Thus, the ALJ determined Lopez was not disabled and not entitled to DIB. [AR 19-20.]

## IV.   <u>MEDICAL HISTORY AND BACKGROUND</u>

### *<u>2005 Records</u>*

Lopez was still working at Lovelace as a medical records clerk through 2005.

She saw Dr. Fontana at Presbyterian Healthcare on three occasions in 2005.  In August 26, 2005, the medical record indicates Lopez was there to re-establish medical care.  She had been

feeling depressed for a month and had frequent crying episodes. [AR 230.] She noted a decrease in her appetite. There was no suicidal ideation, nor any such history. She was not taking medications. Her depression was severe. Dr. Fontana prescribed an anti-depressant, Lexapro, and referred Lopez for counseling with Martha Hand. The record also indicates Lopez had DM but had not been taking medications for diabetes "for years." She was to restart Glucophage[9] and another medication for DM. She was counseled how to test her blood sugars and about diet and exercise. [AR 230.]

On September 9, 2005, Lopez again saw Dr. Fontana. She was tolerating her medications well. Her blood sugars were in the 200s. She tended to forget the evening dose and apparently had been without medication for four days. The note is partially illegible. Lopez's mood was better and she was not crying as much. Dr. Fontana continued the prescription of Lexapro and increased the dosage of Glucophage. He noted that Lopez's depression was improved since starting Lexapro. [AR 228.]

On September 20, 2005, Lopez saw a medical care provider for diabetes counseling. Lopez's diabetes was diagnosed in about 2002. Her blood sugar levels were improving. Lopez had difficulty making healthy food choices, and much of the appointment time was devoted to discussing "portion sizes." [AR 227.]

On December 29, 2005, Lopez saw Dr. Fontana for a cough and sore throat. [AR 226.]

***2006 Records***

Lopez continued to work at Lovelace until June 6, 2006.

---

[9]Glucophage or "Metformin is used with a proper diet and exercise program and possibly with other medications to control high blood sugar. It is used in patients with type 2 diabetes (non-insulin-dependent diabetes). http://www.webmd.com/drugs/drug-11294-Glucophage+Oral.aspx ?drugid=11294&drugname=Glucophage+Oral&source=1 (January 30, 2012)

She saw Dr. Fontana on three more occasions in 2006.  On January 4, 2006, Lopez still had a cold, and the doctor prescribed an antibiotic for bronchitis.  She complained of headaches that had started in late December 2005 and of intermittent dizziness.  [AR 225.]

On April 28, 2006, Lopez followed up with Dr. Fontana regarding lab work in relation to her DM.  She had stopped taking Metformin and Lexapro five months earlier because she was "feeling better."  On this date, she again felt depressed and fatigued.  She had no energy and was tearful.  Her cholesterol level was high.  Dr. Fontana discussed the importance of glucose control and restarted the prescription of Glucophage along with Lovastatin.[10]   He again prescribed Lexapro and recommended counseling with Martha Hand. [AR 224.]

June 6, 2006 was Lopez's last day of work at Lovelace and her alleged onset date of disability. [AR 12.]

On June 7, 2006, Lopez saw Dr. Fontana, again to follow up on complaints of DM and migraine headaches.  She also had bumped her shoulder and complained of pain.  She was taking all of her medications at this time.  Lopez's lowest blood sugar readings were in the 170-180 range.  Dr. Fontana noted that her DM was still not under control.  He prescribed Avandia.[11]  Lopez wanted to increase the dosage of Lexapro, and Dr. Fontana increased it to 20 mg.  She complained of three episodes of migraine headaches over the last month.  Dr. Fontana noted her high blood pressure

---

[10]Lovastatin is used along with a proper diet to help lower "bad" cholesterol and fats (such as LDL, triglycerides) and raise "good" cholesterol (HDL) in the blood. http://www.webmd.com/drugs/mono-92-LOVASTATIN (Jan. 30, 2012).

[11]Avandia or Rosiglitazone is an anti-diabetic drug (thiazolidinedione-type, also called "glitazones") used with a proper diet and exercise program to control high blood sugar in patients with type 2 diabetes (non-insulin-dependent diabetes).  http://www.webmd.com/drugs/drug-17300-Avandia (Jan. 12, 2012).

which he intended to monitor before prescribing medication. [AR 223.] There is no mention in this record that Lopez had quit her job the day before this appointment.

There are no additional medical records in 2006, and none until September 18, 2007, notwithstanding the alleged onset date of disability in June 2006.

### *2007 Records*

Lopez apparently was not working in 2007.    There are no medical records until September.

On September 18, Lopez saw Dr. Gallegos-Macias at Presbyterian to discuss her DM, depression, and migraine headaches.  Lopez was due for a refill of Metformin but had not been taking it.  She also had not been checking her blood sugars often and had difficulty adhering to a diabetic diet due to her severe depression.  Dr. Gallegos-Macias noted that Dr. Fontana had increased the prescription of Lexapro to 20 mg per day.  However, Lopez had stopped taking it because she felt it was not helping.  She also had tried another antidepressant, Wellbutrin, in the past but did not feel it was helpful either.

Lopez described mood swings, emotional lability, and decreased interest in activities.  She denied any suicidal ideation but lacked hope overall.  She also noted "stressors at work," but it is not clear from the record where or if Lopez was working at this point. [AR 221-22.]

Lopez reported having migraines once a week, including phonophobia,[12] photophobia,[11] and auras.  She had tried taking Midrin,[12] without relief.  She felt nauseated with the migraines.  The headaches were ongoing for several months.

Dr. Gallegos-Macias observed that Lopez appeared fatigued and exhibited a mood with a "flat affect."  She was crying secondary to depression.  She felt no hope, but was described as having good judgment and insight.  Lopez felt she needed to live for her children and family but was not confident she could do this without help.  [AR 222.] Dr. Gallegos-Macias diagnosed her with DM II that was uncontrolled.  She intended to prescribe Glucotrol,[13] after reviewing the lab work.  Lopez's depression was worsening so Dr. Gallegos-Macias prescribed 37.5 mg of Effexor, an antidepressant, instructing Lopez to increase the dosage in four days.

Like Dr. Fontana, Dr. Gallegos-Macias recommended Lopez see Martha Hand for counseling.  Lopez declined, stating she did not feel counseling would help.  Dr. Gallegos-Macias prescribed Imitrex[14] for migraine headaches. [AR 222.]

---

[12]Phonophobia is heightened sensitivity to sound.  Examples: The phonophobia experienced during a Migraine can make it difficult to be around other people. http://headaches.about.com/od/medicalterms/g/phobophobia.htm (Jan. 30, 2012).

[11]Photophobia is eye discomfort in bright light. Severe photophobia may occur with eye problems and can cause severe eye pain even in relatively low light. http://www.nlm.nih.gov/medlineplus/ency/article/003041.htm (Jan. 30, 2012).

[12]This combination medication is used to relieve tension and migraine headaches. Acetaminophen helps to decrease the pain from the headache. http://www.webmd.com/drugs/drug-6603-MIDRIN  (Jan. 30, 2012).

[13]Glucotrol or Glipizide is an anti-diabetic drug (sulfonylurea-type) used along with a proper diet and exercise program to control high blood sugar. It is used in patients with type 2 diabetes (non-insulin-dependent diabetes).  http://www.webmd.com/drugs/drug-11773-Glucotro (Jan. 30, 2012).

[14]Imitrex or Sumatriptan is used to treat migraines. It helps to relieve headaches, pain and other symptoms of migraines, including sensitivity to light/sound, nausea, and vomiting. http://www.webmd.com/drugs/drug-11571-Imitrex  (Jan. 30, 2012).

On September 28, 2007, Lopez filled out the application for DIB.  During a face-to-face interview, the disability services employee observed that Lopez had difficulty hearing, concentrating, and seeing. [AR 99.] Lopez reported her migraines had started in the early 1980s. She noted feeling depressed most of her life, but had reached a point where she felt she might be better off dead.  Lopez stated that one of her sons suffered from paranoid schizophrenia and another son had a "bad drinking problem."  These family problems made Lopez feel very sad. [AR 100.] Lopez's mother died when Lopez was one year old.  Lopez's aunt then cared for her.  But the aunt died when Lopez was 16 years old, and Lopez had taken care of herself since that age.  She had married,  which she described as "ruining my life," then divorced, and married again.  Lopez felt "so alone," and felt like ending her life many times.  She was "tired of life" and "wished the lord would take her home."  She had no motivation to get up, get showered, or look good. [AR 100.]

On October 9, 2007, Lopez filled out a headache questionnaire, noting she suffered from headaches about two to three times a week.  The headaches affected her vision, caused pain, and made her dizzy.  Light bothered her.  She vomited when she had the headaches and felt numbness in her face and body.  After the migraines subsided, she felt like her "head was kicked around."  She took three tablets of Imitrex when she had migraines.  She darkened a room and slept.  The migraines lasted all day until the next morning. [AR 102.]

Also on October 9, 2007, Lopez filled out a dizziness questionnaire.  She reported feeling lightheadedness.  Objects were spinning or turning, or she felt like she was turning or spinning inside.  She lost her balance when walking at times.  Lopez had headaches, nausea, vomiting, and pressure in her head.  The dizziness came in "attacks," was not constant, occurred in the morning or evening, and lasted about 4 minutes.  [AR 103.] Lopez was free of dizziness between these

attacks. [AR 104.] She recalled feeling dizzy when she was first told of her diagnosis of DM in 2001 or 2002.

When she felt dizzy, Lopez had difficulty walking in the dark or moving around. Fatigue and exertion precipitated an attack of dizziness. She had double vision with dizziness, numbness, and weakness in her arms or legs. She also had difficulty swallowing and felt pain in her neck that was constant. [AR 105.]

On October 11, 2007, Lopez filled out a Function Report for disability services. [AR 107.] She was living with her family. A typical day included getting up and having coffee, and taking a shower. On a good day, Lopez got ready for her day and could do light house cleaning and feed the dog. If it was a bad day, however, she remained in bed most of the day. Sometimes she felt too lightheaded and useless to do anything. [AR 108.] She did not sleep well and was restless.

Lopez took care of her personal needs and did not need reminders. [AR 108.] Sometimes, she wrote herself reminders to take her medications. [AR 109.] She tended to eat frozen dinners daily. She was able to go out every day to get the mail. [AR 110. Lopez could ride in a car and go out alone, but she might have trouble if she got dizzy. She could drive and shop. She went shopping once a week for about two hours or more. She was able to pay her bills, count change, and handle her accounts. [AR 110.]

Lopez's hobbies were swimming, bike riding, playing basketball, soccer, boating, and dancing but she was not able to do any of these activities now because of "pain," tiredness, weakness, and dizziness. She did not spend time with others but did attend church. [AR 111.] Her husband took her to church because of her concerns over an attack of dizziness. Lopez had no problem getting along with others but did not enjoy social activities now. She "just wanted to sleep." She had difficulties squatting, bending, standing, using stairs, seeing, remembering,

11

concentrating, and using her hands.  Lopez could walk one block, but had to rest five minutes.  She could pay attention for 45 minutes but tended to get confused. [AR 112.] She did not handle stress well or changes in her routine.  Lopez felt like she was dying.  She felt very lonely and sad and cried a lot.  She stated she was waiting to die and did not know why she ever had been born.  She wished she had not been born. [AR 114.]

The day after Lopez submitted this disability report, she again saw Dr. Gallegos-Macias. She reported to Dr. Gallegos-Macias that her blood sugars ranged in the 300 level.  Her cholesterol was high.  She reported that "overall" she had been taking her medications.  While she had been started on 37.5 mg. of Effexor for her depression, she had not followed instructions to increase it. She felt increasingly depressed.  She denied suicidal ideation but lacked hope.  She had not gone to counseling yet but was now willing to make an appointment.  Dr. Gallegos-Macias noted her history of hypercholesterolemia (high blood cholesterol).  Lopez had "self-discontinued" cholesterol medication although she had taken it in the past.

Dr. Gallegos-Macias observed that Lopez was "alert, talkative, oriented, [and] in no acute distress."  Her diagnoses were Type II DM uncontrolled and major depression, recurrent.  Dr. Gallegos-Macias started her on Glucotrol with Metformin and increased the Effexor to 75 mg.  Dr. Gallegos-Macias also prescribed Lipitor for high cholesterol. [AR 220.]  Again, Lopez was referred to Martha Hand for counseling.

On October 15, 2007, a friend of Lopez's, Delfie Zamora, filled out a Third Party Report. [AR 119.] The report is not very detailed.  Zamora had known Lopez for 24 years, and they spoke every day.  Zamora helped Lopez with chores.  Lopez could do light house cleaning and feed her dog.  She could do very little of her personal care.  Lopez fixed TV dinners.  She could walk, drive, and ride in a car.  Her activities depended on how she felt.  She could shop and pay bills.  Her

hobbies included watching TV and playing sports but Lopez could not play sports now.  Sometimes Lopez felt lightheaded.  Zamora commented that Lopez was not happy anymore and was sad most of the time. [AR 125.]

There is an undated Disability Report that Lopez submitted near this time.  Her complaints were DM, migraines, depression, and body aches. [AR 128.] She always felt dizzy or tired.  Lopez cried due to her depression.  She was not working at this time and stated she had stopped working in 2006 because she could not handle stress, was depressed, and was tired all of the time. [AR 128.] She was taking Effexor, Imitrex, and Metformin at this time. [AR 131.]

On November 8, 2007, Lopez had a counseling session with social worker, Martha Hand. [AR 194.] Lopez was 47 years old on this date and had been married for 25 years.  She had three children.  Her chief problems were depression, diabetes, and high cholesterol.  Lopez reported having been depressed off and on for years.  At the end of this counseling session, Lopez told Hand that Lopez had been sexually molested as a child by her grandfather, over a period of years.  This was the first time Lopez had reported the sexual molestation.

Lopez described eating one meal a day.  She could only sleep four hours a night and was not able to sleep past 3 a.m.  She was taking Metformin for DM and Effexor for depression.  She could perform all activities of daily living and had no current legal or financial problems. [AR 195.] There was no record of hospitalizations, but Lopez had a long history of depression.  Hand's record indicates Lopez had been to see Hand previously but that because it was over a year ago, Lopez was considered a new patient. [AR 195.] There are no other counseling records by Hand.

Lopez reported her husband worked for the City of Albuquerque and was in good health. [AR 196.] Her children were 29, 28 and 22.  There was no family history of psychiatric disorders.

Lopez reported hurting all over every day and that the level of pain was an 8 on a scale of 1-10.  Hand noted that Lopez was well groomed, but withdrawn.  She exhibited normal motor activity.  She was "alert, oriented, [and exhibited] normal cognition, speech, [and] language." Lopez's thought process was normal, but her mood was depressed.  She had average intelligence and normal insight.  Lopez presented tearfully saying she hurt all over and was depressed.  She denied any suicidal ideation.  Hand assessed a GAF of 65 with 75 being the highest GAF in the last year.  Hand accepted Lopez for ongoing treatment [AR 198], but there are no records indicating Lopez saw Hand again.

About a week later, on November 16, 2007, Lopez had a consultative examination with Dr. Louis Wynne, Ph.D. [AR 205.] Dr. Wynne conducted testing, and his results were different than Hand's observations on November 8.  Dr. Wynne first observed that Lopez was dressed casually but neatly.  Her hygiene and grooming were appropriate.  Her eye contact was poor; however, she was cooperative.  Lopez wept through most of the session.  Her affect was flat and blunt "congruent with a depressed mood," but she was alert and knew the purpose of the examination.  Lopez's gait was unremarkable.  She spoke clearly but atonally.  Dr. Wynne found no evidence of evasion by Lopez or confusion. [AR 205.] She denied all alterations in consciousness, and there was no indication of drug use.

Lopez's ability to copy a pair of intersecting pentagons was marginal.  She could not remember and carry out a 3-part set of instructions.  Her fund of information was below average, and her ability for abstract thinking was limited.  Lopez could not count back from 100 by 3 or 7. She could remember a set of digits forward only to 4 and backwards only to 3. [AR 205.] Lopez's judgment, based on answers to the WAIS test, was limited.  She could spell a common 5-letter word

backwards.  Her short term memory for "3 times" was unimpaired.  But, Lopez could not perform operations in simple mental arithmetic.

Dr. Wynne found that Lopez's presentation was generally consistent with the disability report she brought with her.  He estimated her intelligence as below average, and her ability to present a plausible, detailed, and comprehensive personal history as impaired.  Therefore, he believed her personal history could not be relied on and should be verified.

Lopez told Dr. Wynne that she was born in Albuquerque and that her mother died when Lopez was one year old.  Her aunt cared for Lopez until the aunt died when Lopez was 15.  Lopez had no contact with her biological father.  She completed the 11th grade at Rio Grande High School and later earned her G.E.D.  Lopez described her childhood as sad, including sexual abuse by her grandfather.  The sexual abuse occurred when Lopez was in elementary school.  Lopez told no one about the abuse until she saw mental health professionals when she was in her 20s. [AR 206.] This conflicts with what she told Hand.  Lopez stated her first contact with a mental health professional was in her 20s but denied any inpatient psychiatric admissions.  She also denied any overdoses or episodes of self-injury.  She reported diagnoses of DM, high cholesterol, and migraine headaches. She was prescribed Metformin, Glipizide, Lipitor, Effexor, Imitrex, and Prilosec.  She took over-the-counter Ibuprofen. [AR 206.]

While Dr. Wynne was not certain Lopez could be relied on for an accurate recitation of her personal history, the history she recounted to him is similar to what she told others.  Dr. Wynne found that Lopez cooperated fully with the exam, and he had no reason to suspect malingering or dissimulation.  She could not remember basic instructions, and her concentration and ability to persist at simple work tasks was at least moderately impaired.  According to Dr. Wynne, Lopez could not interact well with the general public, coworkers, or supervisors, and would have difficulty

adapting to changes in the workplace. Dr. Wynne opined that Lopez could not manage her own benefit payments. [AR 207.]

Dr. Wynne diagnosed Lopez with major depression, recurrent, without psychotic features, and borderline intellectual functioning. He assessed a GAF of 40, just 8 days after Hand assessed a GAF of 65. [AR 208.]

On November 26, 2007, Dr. Gabaldon, with Disability Services, filled out a Psychiatric Review Technique form, concluding Lopez's affective disorder was not severe. She had major depression [AR 235], but her symptoms did not precisely satisfy the diagnostic criteria for listing 12.04. She was mildly limited in activities of daily living, social functioning, and concentration. [AR 242.] Based on the document review, Dr. Gabaldon found that Lopez could care for her personal needs and engage in household tasks and leisure activities. She was able to drive, shop, and relate to others. Gabaldon reviewed Dr. Wynne's report, and summarized that Dr. Wynne had not found a thought disorder or a severe cognitive limitation. Dr. Gabaldon noted that while Dr. Wynne suggested some possible limitations Lopez might have, Gabaldon found Dr. Wynne's stated limitations were not consistent with Lopez's reported "abilities." [AR 244.]

In late November 2007, Lopez's initial application for DIB was denied. [AR 40, 43, 212.]

There is an undated Disability Report-Appeal near this time. Lopez alleged that her condition had changed in November 2007. She now suffered from continual and constant body aches. She had daily migraine headaches with dizziness and nausea. She was very irritable and frustrated daily regarding her uncontrolled sugar levels. She had problems with high cholesterol and lack of sleep. Lopez stated she had continued clinical depression with crying bouts, low self esteem, and constant thoughts of suicide. She isolated from family and friends. Lopez stated she was going to be tested for fibromyalgia that she believed may have started in November 2007. However, there

are no medical records indicating she was tested for fibromyalgia. She also stated she had another appointment on December 7, 2007, but there is no corresponding medical record for that date.

Lopez's list of medications included: Effexor, Glipizide, Imitrex, Lipitor, Metformin, Prilosec, Venlafaxine (generic of Effexor).

Lopez stated she no longer had any interest or energy to do anything. She preferred to be alone. She constantly cried and thought of suicide. She now needed prompting for hygiene and to get out of bed. Her migraines were constant. She suffered from body aches and blurry vision. [AR 145.]

### *2008 Records*

There are no medical records from 2008, but there are disability-related forms. On January 2, 2008, Dr. Scott Walker filled out a mental RFC assessment. Based on a record review, Dr. Walker concluded Lopez had moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended times, perform activities within a schedule, maintain regular attendance and punctuality, sustain an ordinary routine without special supervision, and work in coordination with or proximity to others without distraction. [AR 254.] Dr. Walker also found moderate limitations in Lopez's ability to complete a normal workday and week without interruptions from psychologically-based symptoms and to perform at a consistent pace, interact appropriately with the general public, accept instructions and respond appropriately to criticism, get along with coworkers or peers, and respond appropriately to changes in the work setting. [AR 255.] There were no "marked" limitations. Dr. Walker further noted that Lopez denied suicidal ideation or a history of suicidal attempts at the consultative exam and the counseling intake. The third-party report suggested to Dr. Walker that Lopez had minimal limitations. Dr. Walker opined that Lopez could "understand, remember, and

17

carry out detailed but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with coworkers and supervisors, and respond appropriately to changes in a work setting. [AR 256.]

Dr. Walker also filled out a Psychiatric Review Technique form.  Under "affective disorder," listing 12.04, he checked off five categories:  appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating, and thoughts of suicide.  As for the "B" criteria, Dr. Walker found mild daily activity restrictions; moderate limitations in social functioning and maintaining concentration; and no episodes of decompensation.  There were no marked or extreme limitations. Dr. Walker noted that Lopez was going to be tested for fibromyalgia and seemed depressed.  He further commented that in November 2011, Dr. Wynne found Lopez had "below average intelligence" and assigned a GAF of 40.  Dr. Walker wrote that while Dr. Wynne found marked limitations, Hand concluded Lopez was of "average intelligence." [AR 270.]

In January 2008, Lopez's request for reconsideration was denied. [AR 42, 51, 272.]

There is an undated Disability Report-Appeal near this time.  Lopez stated her condition had changed in February 2008.  Her sugar levels were unstable and she now had started taking Insulin two times a day.  However, there are no corresponding medical records that confirm she was prescribed Insulin.  She continued to feel fatigued and weak.  She suffered from body aches and constant pain.  She was very argumentative, irritable, and frustrated.  She continued to feel depressed and had crying bouts.  She had thoughts of wanting to die. [AR 152.]

Lopez stated she had seen Dr. Gallegos-Macias in February 2008 and had another appointment with her on February 23, 2008, but there are no corresponding medical records.  Lopez also stated she had another appointment scheduled with Martha Hand in March 2008, but again there are no corresponding counseling records. [AR 154.]

### *2009 Records*

Lopez testified that she was working for a friend from March 2009 to September 25, 2009, and that she was able to drive in relation to that work. She earned about $129.00 every two weeks. The ALJ did not consider this to be significant gainful activity. [AR 14, 23-24 162.]

Again, there are no medical records in 2009, other than a July 2009 daily calendar Lopez was keeping as to her blood sugar numbers which ranged from the 200s to 400s. [AR 163.]

On July 20, 2009, an ALJ hearing was held in Albuquerque. Lopez was represented by counsel. [AR 23.] She explained that she left her longtime job at Lovelace in 2006 because she had become "really sick" from DM. She also felt stressed, suffered from headaches, and could not cope. She left the position on her own volition. [AR 24.] Lopez stated she was looking for full-time work. [AR 25.] She was able to earn money from her friend's job. In addition, Lopez's husband worked.

Lopez did not feel she could return to her old position because her "brain bothered her" and she could not concentrate. [AR 26.] She stated she saw a doctor every once in a while and that Guy Achles was her doctor. However, there are no corresponding medical records indicating Dr. Achles had seen Lopez.

She further testified she had not been to a doctor for awhile because of all the prescriptions she was taking. She could not afford it. Her blood sugars ranged from 220 to 400 but she watched what she ate and did not smoke. She lived with her husband, daughter and 4-year old grandson. [AR 27.] When she was not helping her friend, Lopez stayed at home, slept a lot, and watched TV. She had dizziness and blurred vision because of DM that occurred daily and lasted about 8 minutes. [AR 27.] Nothing helped other than to "wait it out."

Lopez's husband took her to the store for grocery shopping. She sometimes suffered from lingering headaches all week long. She took Ibuprofen 800 mg. but it did not help. She slept poorly

and did not leave the house except when her husband took her out or when she worked for her friend, which occurred once or twice a week.  Lopez used to be able to ride a bike and swim but no longer could engage in those activities.  Lopez stated she was better on some days.

When asked by the ALJ what one symptom she would "get rid of" if she could, Lopez answered "my depression."  Yet, when asked if she was taking any medications for depression, she responded: "No, I was," but the medications did not seem helpful.  She admitted she may not have taken the medications for a long enough period. [AR 29.]

Lopez's attorney asked her about the end of her employment at Lovelace.  She testified that she no longer felt like getting up anymore.  Her body was very tired.  The DM made her very tired, sluggish, and dizzy.  She was unable to concentrate although she was not sure it was due to the DM.  She suffered from migraines a lot and had missed work because of headaches perhaps 8 times in the last 6-12 months of her job. [AR 30-31.] She did not suffer from as many migraines after she left work, although she had about 1-2 migraines each month.  She took Imitrex for migraines and slept in a dark room.  She typically fell asleep and then threw up when she awoke.  Once she threw up, the pain went away and she was able to sleep again until she woke up again and threw up. [AR 31.] Her migraines lasted two days if she used medication.  Without medication, the migraines lasted all week.  Lopez stated she had taken Insulin for about a year and that her blood sugar levels should be about 100. [AR 32.] She had trouble affording medications and co-pays for doctors' visits. [AR 32.] It cost Lopez $30 to see the psychiatrist, $20 to see a doctor, and $30 to see a counselor.  Her medication ran about $20-$30 each. [AR 33.]

Lopez testified about her feelings of depression, that she would rather be dead, and wanted to "just die."  She did not feel she would act on these thoughts but did not know and stated again that she thought about it a lot.  She felt like her depression or these feelings were getting "worse and

worse."  "I hurt and don't want to be here."  She wanted to be "asleep in peace." [AR 34.] She had

crying spells every day.  Lopez felt more medication and counseling would help with her depression.

[AR 34.]

At this point, the ALJ closed the hearing, but apparently there was some confusion.  Later,

the ALJ reconvened the hearing, stating he had misunderstood Lopez's attorney's intention and had

prematurely ended the hearing.  Lopez was no longer present but she was not a material witness at

this time.  This was an extension of the original hearing to ask questions of the vocational expert.

Lopez's attorney waived Lopez's presence.  The attorney then asked the VE some questions,

concerning moderate limitations to perform certain activities, as set forth by Dr. Wynne. [AR 36.]

The attorney asked the VE to assume Lopez had four moderate limitations.  The VE was concerned,

based on those limitations, whether Lopez could maintain a job.  If she could not keep up with the

schedule and required more than ordinary supervision, there would be a concern.  The attorney then

added a new restriction to the hypothetical, incorporating part of Dr. Wynne's report, that Lopez was

unable to remember basic instructions.  The VE testified this would eliminate Lopez's ability to do

her past relevant work.  If she could not remember basic instructions, she was unable to do other

work. [AR 38.]

The ALJ asked only one question of the VE earlier in the hearing. [AR 25.] He noted the

moderate limitations by Dr. Walker and asked the VE if those moderate limitations would include

"the prior work." [AR 25.] The VE testified: "Yes, it would, your honor."

In a letter from Lopez's attorney to the ALJ, dated July 24, 2009, the attorney discussed the

ALJ's question to the VE. [AR 164.]

On September 25, 2009, the ALJ issued an unfavorable decision, denying Lopez's request for DIB. [AR 12-20.] The ALJ considered Dr. Wynne's diagnoses but did not give his opinions weight. [AR 18.] There were no treating doctors who indicated Lopez was disabled. [AR 18.]

On November 23, 2009, Lopez's attorney sent a letter to the Appeals Counsel, discussing Dr. Wynne's November 2007 report.

On November 25, 2009, Lopez requested review. [AR 6.]

There are no records of any type from 2010.  It took the Appeals Council over a year to deny Lopez's request for review on February 1, 2011. [AR 1.]

**V.    DISCUSSION**

A.    Alleged Legal Errors

Lopez alleges "many errors" by the ALJ. [Doc. 17, at 19.] She argues, for example, that the ALJ's RFC finding either was erroneous or unsupported by substantial evidence because the ALJ improperly gave Dr. Wynne's opinion no weight and afforded more weight to the opinion of the non-examining physician, Dr. Walker. [Doc. 17, at 7-10.] Lopez further contends that the ALJ erred in finding she could return to her past relevant work, in part, because the ALJ failed to determine the physical and mental demands of the medical records position in deciding that she still could perform that work.  Lopez also asserts that the ALJ's finding that medication would alleviate her symptoms was contrary to the evidence and the law, that the ALJ's credibility determination was flawed, and that the alternative step five finding was contrary to law.

B.    Analysis

The Commissioner addresses Lopez's last argument first concerning credibility and devotes seven pages of analysis to the issue of credibility. [Doc. 20, at 4-11.] While Lopez's credibility is questionable based on her noncompliance with medications and recommendations for counseling,

22

the Court elects to remand as to the ALJ's RFC findings and treatment of medical source opinions. Lopez's credibility can be re-evaluated on remand. *See* Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009) (noting "credibility and RFC determinations are inherently intertwined").

### STEP FOUR RFC FINDINGS

Step four of the sequential evaluation process requires the ALJ to (1) evaluate the claimant's physical and mental capacity (RFC); (2) determine the physical and mental demands of the claimant's past relevant work; and (3) decide whether the claimant has the ability to meet these job demands despite the mental or physical limitations found in phase one. Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (citations and internal quotation marks omitted); Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir.1996). At each of these three phases, the ALJ must make specific findings. Id.

During the step four analysis, the ALJ may rely on information provided by a VE, but the "ALJ himself must make the required findings on the record, including his own evaluation of the claimant's ability to perform her past relevant work." Winfrey, 92 F.3d at 1023. While the claimant bears the burden of proof at step four, the ALJ has the duty of inquiry and factual development. Henrie v. U.S. Dept. of Health and Human Servs., 13 F.3d 359, 361 (10th Cir. 1993). Stated differently, the Commissioner's basic obligation is to "fully investigate the physical and mental demands of a claimant's past work and compare them to current capabilities." Hayden v. Barnhart, 374 F.3d 986, 991 (10th Cir. 2004) (*per curiam*).

In the first phase of the RFC inquiry, the ALJ relied on limitations found by non-treating psychiatrist, Dr. Walker, that Lopez could perform light work that includes the ability to "understand, remember and carry out detailed but not complex instructions, make decision[s], attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors and

23

respond appropriately to changes in a work setting." [AR 15.]  These were Dr. Walker's exact words.  [AR 256.]  Dr. Walker conducted a record review on January 2, 2008, but did not see or treat Lopez.

At the first phase, the ALJ also considered medical records of Dr. Gallegos-Macias, social worker Martha Hand, consultative Ph.D. Louis Wynne, Lopez's function reports, and Lopez's description of her daily activities.  [AR 15-18.]  With respect to Dr. Wynne's consultative examination of Lopez, the ALJ wrote–

> . . . the claimant alleged diabetes, migraines, depression and body aches.  The claimant denied any inpatient psychiatric admissions. Based on Wechsler Adult Intelligence Scale-type comprehension questions, [Lopez's] answers were limited.  It was estimated her intelligence was below average. . . . Dr. Wynne reported that claimant could not remember basic instructions and her concentration and ability to persist at simple work tasks was at least moderately impaired.  She could not interact well with the general public, her coworkers, or her supervisors, and she would have difficulty adapting to changes in the workplace.  Further, she could recognize obvious hazards but she could not manage her own benefit payments.  Dr. Wynne's diagnoses included the following: major depression, recurrent, severe, without psychotic features; borderline intellectual functioning, and a Global Assessment of Functioning (GAF) at 40.

[AR 17.] While not required to discuss every record or every detail of a medical record, the ALJ did not mention Dr. Wynne's conclusion that Lopez was fully cooperative; that there was no evidence of evasion; and that there was no reason to suspect Lopez of malingering or dissimulation. [AR 207.] Nor did the ALJ discuss the specific results of Dr. Wynne's testing, *e.g.,* that Lopez could not remember and carry out a 3-part set of instructions; she could not count back from 100 by 3 or 7; her judgment was limited; she could not perform operations in simple mental arithmetic, and she had limited abstract thinking. [AR 206.]

Nonetheless, the ALJ did summarize a portion of Dr. Wynne's November 2007 mental status examination but concluded that Dr. Wynne's opinions merited no weight. [AR 18.] The ALJ's explained that Dr. Wynne's opinions were "inconsistent with the overall medical evidence." [AR 18.] In contrast, the ALJ concurred with and adopted Dr. Walker's opinions from January 2, 2008.[15] [AR 17.]

The ALJ did not specify what inconsistencies existed in the "overall medical evidence." He primarily summarized medical records, although the ALJ may have found Lopez's recitation of daily activities was inconsistent with Dr. Wynne's findings. Without more explicit findings, the Court cannot determine whether the ALJ's decision to reject Dr. Wynne's opinions is supported by substantial evidence. This is particularly true in a case where the ALJ disregards the opinions of a consulting physician who actually saw Lopez but credits the non-treating physician who merely conducted a record review. *See, e.g.,* Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004) (the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all).

In addition, the ALJ did not comment on the significant inconsistencies between reports by non-treating physicians J. LeRoy Gabaldon, Ph.D. and Dr. Scott Walker. Both record-reviewing medical sources filled out Psychiatric Review Technique forms, less than two months apart. [AR 232, Gabaldon, 11/26/07; AR 268, Walker, 1/2/08.] Gabaldon concluded there were no moderate limitations. [AR 242.] Dr. Walker concluded there were moderate functional limitations in two out of three areas. [AR 268.] Under the Affective Disorder portion of the form, Gabaldon found no depressive syndrome based on the criteria. [AR 235.] In contrast, Dr. Walker found a disturbance

---

[15]The ALJ misstated the date of Dr. Walker's report as November 16, 2007. [AR 17.] Dr. Walker's report is dated January 2008. [AR 256.]

of mood on the very same form, and marked appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating, and thoughts of suicide. [AR 261.] Moreover, it is not entirely clear whether Dr. Walker's assessment of moderate functional limitations [AR 254-55, 268] is internally consistent or inconsistent with his finding that Lopez could interact adequately with co-workers and supervisors and respond appropriately to changes in a work setting. [AR 256.]

Other inconsistencies or conflicts exist in the medical evidence as well.  For example, social worker Hand assessed Lopez with a GAF of 65 only eight days before Dr. Wynne determined a GAF of 40.  However, Hand did not conduct any objective testing while Dr. Wynne did.  Hand's report includes subjective reporting by Lopez along with Hand's observations of Lopez.  Hand's report is handwritten and contains sentence fragments, fill-in the blanks, and boxes to check off. [AR 197.]  Dr. Wynne's typewritten report is significantly more detailed and thorough than Hand's.

These types of inconsistencies and conflicts in the medical evidence triggered the ALJ's duty to seek further development of the record before rejecting Dr. Wynne's opinion in its entirety.  *See, e.g.,* 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.")  Notwithstanding the claimant's burden at step four of the sequential process, the ALJ has the responsibility to adequately develop the record.  *See* <u>Robinson</u>, 366 F.3d at 1084 ("The responsibility  to see that this duty [to seek further development of the record] is fulfilled belongs entirely to the ALJ. . . .").

The Court cannot re-weigh the evidence.  Without specific findings set out at phase one of step four, the Court is unable to determine whether the ALJ's decision to reject Dr. Wynne's opinion

26

is supported by substantial evidence, and accordingly whether the RFC is supported by substantial

evidence.  Thus, the Court remands for additional administrative proceedings to allow the ALJ to

fully develop the record and set forth specific reasons for rejecting the consulting physician's

opinions, should that again be the ALJ's decision.

The ALJ's decision is flawed for a second reason as well.  There is no indication in the ALJ's

decision that he properly determined the demands of Lopez's past relevant work at phase two of the

RFC analysis.  Thus, the Court cannot decide whether the ALJ's conclusion that Lopez could

perform her past relevant work was supported by substantial evidence.

In the decision, the ALJ summarily concluded that Lopez was capable of performing her past

relevant work as a medical records clerk and that the work did not require the performance of work-

related activities precluded by her RFC. [AR 18.] The ALJ then stated–

> The vocational expert testified that the claimant had past relevant
> work as a medical records clerk that is considered light and semi-
> skilled work.  I asked the vocational expert to consider an individual
> with the claimant's age, education, work experience, and residual
> functional capacity.  I then asked the vocational expert is [sic] such
> an individual could perform their past relevant work.
>
> The vocational expert testified such an individual could perform their
> past relevant work.  Accordingly, the claimant is able to perform past
> relevant work as a medical records clerk.

[AR 18-19.]

After a careful review of the transcript of the ALJ hearing, the Court could locate no

testimony where the VE testified Lopez had past relevant work as a medical records clerk that was

considered light and semi-skilled work.  Nor did the Court find that the ALJ asked the VE to

consider an individual with Lopez's age, education, etc., as to whether she could perform her past

relevant work.  After the ALJ asked Lopez several questions about why she left her employment at

27

Lovelace [AR 24-25], the ALJ noted the denial of benefits was in the record "as exhibit 12-F [Dr. Walker's Mental RFC Assessment]." The ALJ repeated Dr. Walker's language to some extent although it may not have been correctly transcribed because there are omissions and incomplete sentences.

> ALJ:   Can remember, understand, several moderate limitation [sic], understood by Dr. Walker [phonetic] to mean can understand, remember, carry out and detail, but not complex instructions; make decisions, attend [phonetic] and concentrate for two hours at a time, interact adequately with co-workers and supervisors; respond appropriately changes in the work setting. Would that include the prior work Mr. Griner?
>
> VE:    Yes, it would, your honor.

[AR 25.] This is the full exchange between the ALJ and VE at the hearing. Later, the ALJ closed the hearing by mistake and then reopened it. At that point, Lopez's attorney, without Lopez present, asked the VE several questions that related more to limitations set out by Dr. Wynne. [AR 36-38.]

While it may have been understood that Lopez's prior relevant work was light and semi-skilled, there was no corresponding testimony from the VE. Nor did the ALJ cite the DOT for this information. Counsel for both parties discussed the pertinent DOT code for a medical records clerk in their briefing, but this is not a case where that evidence is of record in any way.

The ALJ did not determine, as he must, what the mental and physical demands of Lopez's prior relevant work were before concluding she could still perform the job. He did not specify factual findings at phase two of the RFC analysis. While he could have relied on testimony by the VE at this stage of the analysis, the VE did not provide any such testimony. The ALJ also could have considered the functional demands and job duties of the position as generally required by employers throughout the national economy, or the ALJ could have relied on Lopez's description of her prior work. However, he made no such findings. His step four RFC analysis is insufficient.

28

*See, e.g.,* <u>Frantz v. Astrue</u>, 509 F.3d 1299, 1304 (10th Cir. 2007) ("The ALJ's conclusory statement that '[t]he exertional and non-exertional requirements of this job [as a general clerk] are consistent with the claimant's [RFC]' is insufficient under <u>Winfrey</u> to discharge his duty to make findings regarding the mental demands of [the claimant's] past relevant work."). In this case, there are no findings as to either the mental or physical demands of Lopez's prior work.

Based on above-mentioned reasons, the Court must remand this case for additional administrative hearings. On remand, the ALJ should engage in the full <u>Winfrey</u> analysis, including making explicit findings at all three phases of the step four RFC inquiry. The ALJ is reminded that if he should make phase two findings as to Lopez's past relevant work, he should examine the mental and physical demands of that work and re-determine whether she can perform that work based on her RFC. If the ALJ gives no weight to an examining physician's opinion, the ALJ must provide specific reasons why he rejects the physician's opinion. If the ALJ's decision to disregard a physician's opinion is premised on "inconsistent medical evidence," that evidence should be identified. If there are significant inconsistencies and conflicts in the medical record, the ALJ should conduct the appropriate investigation and development of the record.

Because of the decision to remand based on the ALJ's erroneous or unsubstantiated step four RFC findings, the Court does not reach the alternative finding at step five, or any additional arguments for remand.

IT IS THEREFORE ORDERED that Lopez's motion is GRANTED, with the result that this matter is remanded for further administrative proceedings consistent with this opinion.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge